<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| **IN RE: SONYA D. PETTAWAY**       Chapter 7 Debtor | **CASE NO. 11-36507-DOT** |
| **SONYA D. PETTAWAY**       Plaintiff, v. | **Adversary Proceeding No. 11-03285-DOT** |
| **DEPARTMENT OF EDUCATION**       Defendant. | |

<u>**MEMORANDUM OPINION (UNPUBLISHED)**</u>

Chapter 7 debtor plaintiff Sonya Pettaway owes the defendant U.S. Department of Education approximately $19,364 for an education loan that she took to help finance her college education, which she completed in 1997. She initiated this adversary proceeding by filing a complaint that requests this court to determine that requiring her to repay the loan would constitute an undue hardship. Such a determination would result in debtor receiving a discharge of the loan pursuant to 11 U.S.C. § 523(a)(8).

Trial on debtor's complaint was held October 1, 2012. At the court's request following trial, the Department of Education submitted proposed findings of fact and conclusions of law on October 3, 2012 (docket 114). Debtor filed an objection to the Department's proposed findings and conclusions on November 5, 2012 (docket

1

110).

For reasons stated in this memorandum opinion, the court finds that under applicable standards, requiring debtor to repay the education loan debt will not impose an undue hardship on her, and therefore the debt will not be discharged in debtor's chapter 7 case.

Findings of Fact.

Debtor filed this individual chapter 7 case on October 13, 2011. She is 52 years of age and resides alone in a federally subsidized rental apartment in Waverly, Virginia. She has no dependents.

Debtor received a B.S. degree in business administration in 1997. The student loans at issue in this case were obtained to finance that education. As of September 17, 2012, the balance owed on the loans was $19,364.79.

In January 2000, debtor had been recently employed with the National Academy of Sciences as a technical trainer earning $53,000 per year. In that month she was involved in an automobile accident and suffered a back injury. She obtained treatment for the injury and underwent surgery in September 2000. Postoperatively, she saw her physician in November 2000 and again in November 2001.

Debtor has been unemployed since her January 2000 accident. She never requested a reasonable accommodation in an effort to retain her employment with the National Academy of Sciences. At no time since the accident has she completed any job application, interviewed for any job, or inquired with potential employers

2

about job availability.

On July 14, 2003, the Social Security Administration issued a "fully favorable" notice of decision to debtor. (Pl's. Ex. 2.) Since that determination, debtor has received monthly Social Security Disability Income (SSDI). This income is her primary means of financial support; the current monthly amount is $1,091.

In her employment with the National Academy of Sciences, debtor was enrolled in the National Academy of Sciences Group Total Disability Insurance Plan. According to the plan, "benefits are awarded to participants who are 'totally disabled' or have a 'total disability.'" (Def's. Ex. F, p. 4.) Following debtor's injury in January 2000, she was approved for long term disability benefits under the disability policy of the National Academy of Sciences. However, in August 2004, the Academy's insurance administrator sent debtor a letter stating that her disability benefits were being terminated because the administrator did not have sufficient documentation "to support [her] inability to perform any occupation for which" she was qualified. (Def's. Ex. F, p. 11.)

On June 21, and then on July 21, 2005, debtor underwent medical examinations of her condition that were conducted on behalf of the National Academy of Sciences disability insurance plan administrator. From these examinations, the plan administrator determined that debtor was not totally disabled. (Def's Exs. M, N, O.) When debtor sought judicial review the administrator's determination was upheld by the District Court for the District of

3

Columbia. (Def's. Ex. F.)[1]

The determination that debtor was not totally disabled was based, in part, on findings of the 2005 examinations in which debtor's "self limiting behavior" and "inconsistencies" in her responses to tests were observed. According to one examination report, debtor's test performance "was completely inconsistent with what she did on her feet in walking to the office and getting on and off the exam table . . . ." Respecting debtor's "pin" test, " there were such inconsistencies with the report of where the pin was and wasn't felt that it didn't match any confident or recognizable patterns . . . of sensory loss." (Pl's. Ex. 20; Def''s. Ex. M, p.10; Def's. Ex. O, pp. 2-4.)

According to Physical Work Performance Evaluation Summary conducted on June 21, 2005, debtor "failed 7 of the 7 consistency criteria. . . . [T]he chances of a compliant patient failing 7 of the 7 criteria are *significantly* less than one in one million." (Def's. Ex. M, p. 11, Ex. 0, p. 2 of 7.)[2]

As mentioned, the result of the two examinations in 2005 was a determination by the National Academy of Sciences disability plan administrator that debtor was not totally disabled. In fact, the tests revealed that debtor was capable of sedentary work. One report stated that debtor "could return to full-time

---

[1] The district court opinion (Ex. F) affirming the administrator's determination that debtor was not totally disabled contains a comprehensive history of debtor's claims for the National Academy of Sciences disability insurance.

[2] Several additional inconsistencies are noted on pages 2-4 of Exhibit O.

4

work in a sedentary capacity within a month or two of starting half a day work cycles." (Def's. Ex. M, p. 13, Ex. N, p. 2.)

At trial, debtor offered no medical documentation as to her current condition, the current nature of her disability, the extent of any current impairment, or the prognosis for her future condition. Her most recent documents were dated November 21, 2005 (Pl's. Ex. 10); and March 23, 2006 (Pl's. Ex. 11). These exhibits also do not discuss the extent of the plaintiff's impairment as it existed at the time, nor any prognosis for the future. Michael E. Goldsmith, M.D., identified a recommended course of treatment as of November 2005. He stated: "I have recommended a series of epidural injections. . . . If these do not alleviate her symptoms, then surgical intervention would be warranted." (Pl's. Ex. 10.) Debtor currently treats her back condition with quarterly injections. No surgery has been performed since Dr. Goldsmith offered it as an option should the injections not alleviate symptoms.

With respect to the debtor's future capacity to work, her attending physician, Dr. Stopak, stated in a statement dated September 17, 2004, that he "expected the [debtor's] condition to improve . . . after surgery [and that he] "anticipate[d her] return to work date [to be] 3 months after surgery, full-time." (Pl's. Ex. 7, p. 3, lines 18-19; Def's. Ex. Z, p. 3, lines 18-19.) During the time debtor was attempting to have her disability insurance reinstated, she relied on other statements of Dr. Stopak to the effect that she was totally disabled and could not return to work. However, Dr. Stopak's views were not consistent (see Pl's Ex. 7), and the administrator's

5

physicians did not agree with this diagnosis. (Def's Ex. M, p. 7.)

In 2002, debtor traveled by automobile from her home in Washington, D.C., to Florida where she spent an extended period of time. She returned home from Florida by automobile. She also has made trips from her home in Washington, D.C., and Virginia to Atlantic City, New Jersey, by automobile and train.

During the period from July 26, 2010, through January 3, 2012, debtor spent $5,643.94 in the form of gambling expenses at the Borgata Hotel Casino in Atlantic City, New Jersey, making ten separate visits during the one and one-half year period. Debtor made a trip to the casino once a month between February and June 2011. (Def's. Ex. G.) Additionally, debtor made cash, check, or "counter" deposits to her checking account totaling $4,131.00 between July 21, 2010, and August 5, 2011.

By judgment order dated February 10, 2006, debtor was awarded the sum of $22,000 in the form of an arbitration award for personal injuries she experienced when she slipped and fell on January 17, 2003, at Caesars Atlantic City, upon returning to her hotel room after an evening of gambling. (Def's. Ex. E.) Bank records show that debtor received at least $10,939.85 from the award. (Def's. Ex. J., p. 3, deposit of $8,439.85, Mar. 28, 2006[3]; Def's. Ex. K , advance deposit of $2,500.00, Jan. 9, 2006.) A large portion of the award–$6,540.93–was spent by the debtor in Atlantic City between the dates of March 27, 2006, and April 6, 2006. (Def's. Ex. L, "Atlantic City NJ" expenditures at "Prk Pl & Boardwalk," "Trump

---

[3] Def's. Ex. J, third page, "out of state counter deposit."

Plaza" "Gca* Borga;" ATM withdrawal at "Philadelphia PA;" "Amtrak" expenditures.)

Debtor was offered a settlement, including a lump sum totaling at least $70,000.00, for personal injuries from the January 2000 automobile accident, which she accepted. (Def's. Ex. P.)  No testimony or documentation established how much of the award was paid to debtor. Debtor also received a lump sum payment from the Social Security Administration in 2003 in the amount of $21,751.67. (Def's. Ex. Q.)

None of the lump sum amounts the debtor received pursuant to the personal injury awards or from Social Security were used to pay any of the student loans.

During the period June 2011 through September 2012, debtor made monthly payments of $126 toward an installment loan owed by her mother.[4] This was an actual expenditure that she voluntarily paid and established that she could maintain a minimal standard of living while paying an additional $126 per month .

Debtor made a total of 13 payments toward her student loans: two in 1997; two in 2000; and the balance in 2001, for a combined total of $2,192.45. (Pl's. Ex.12.) No payments have been made since December 17, 2001.

Debtor sought and obtained forbearances and deferments from the Department of Education.

<u>Discussion and Conclusions of Law.</u>

Student loans are generally non-dischargeable. However, the exception to

---

[4]Def's. Exs. H; AA, pp. 0006-12, 0014-18; BB, pp. 0006,0008,0010.

this rule allows student loans to be discharged when forcing repayment would impose an undue hardship on the debtor and the debtor's dependents. 11 U.S.C. § 523(a)(8).[5]

BURDEN OF PROOF

The burden of proving undue hardship is on the debtor. *Wilson v. Educ. Credit Mgmt. Corp. (In re Wilson)*, 2002 WL 32155401 at *2 (Bankr. E.D. Va. 2002) (citing *United States v. Wood*, 925 F.2d 1580, 1583 (7th Cir. 1991)). Congress did not define "undue hardship" in the Bankruptcy Code, and therefore it is incumbent upon the courts to supply a meaning to the term. *See Kapinos v. Graduate Loan Ctr. (In re Kapinos)*, 243 B.R. 271, 274 (W.D. Va. 2000). The courts have provided a stringent test for undue hardship.

The majority of courts deciding the issue have relied on the test set out by the Court of Appeals for the Second Circuit in *Brunner v. N.Y. State Higher Educ.*

---

[5] (a)   A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –

> (8) unless excepting such debt from discharge under this paragraph would impose an *undue hardship* on the debtor and the debtor's dependents, for--
>
> > (A)(I) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
> >
> > (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend;

11 U.S.C. § 523 (emphasis added).

*Servs. Corp. (In re Brunner),* 831 F. 2d 395, 396 (2d Cir. 1987). The Fourth Circuit Court of Appeals adopted the *Brunner* test in *Ekenasi v. Educ. Res. Inst. (In re Ekenasi),* 325 F.3d 541, 546 (4th Cir. 2003). *See also Spence v. Educ. Credit Mgmt. Corp.(In re Spence),* 541 F.3d 538 (4th Cir. 2008), *cert. denied,* 129 S. Ct. 1319 (2009); *Educ. Credit Mgmt. Corp. v. Mosko, (In re Mosko),* 515 F.3d 319 (4th Cir. 2008). The *Brunner* three part undue hardship test requires the debtor to show:

> 1) that the debtor cannot maintain, based on current income and expenses, a "minimal"standard of living for herself and her dependents if forced to repay the loans;
>
> 2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>
> 3) that the debtor has made good faith efforts to repay the loans.

*In re Brunner,* 831 F.2d at 396.

ANALYSIS OF EVIDENCE

Debtor asserts that requiring her to repay the education loan would impose an undue hardship on her, claiming that since her injury and surgery in 2000 she has been unable to work because of an inability to sit or stand for significant periods of time. She relies upon the decision of the Social Security Administration in July 2003 that she is permanently disabled. However, debtor offered no medical documentation for her current condition, the nature of her disability, the extent of any current impairment, or the prognosis for her future condition.

Given the later evidence, little weight can be given to the 2003 disability determination of the Social Security Administration. The more recent and thorough

9

documentation from the National Academy of Sciences disability insurance administrator rather firmly demonstrates that in 2005 debtor was not totally disabled, but rather was capable of sedentary work. There is no basis in the record for the court to conclude that debtor's condition has significantly deteriorated since the 2005 examinations.

Throughout this adversary proceeding debtor has advanced the argument that the court should not consider sums she received from social security or personal injury recoveries because of the exempt nature of these receipts. This argument lacks merit. The test for undue hardship is whether a debtor's financial condition prevents payment of the education debt — not whether funds received by debtor are distrainable.

Finally, the evidence shows that during the years 2011 and 2012 debtor made monthly payments of $126 toward a bank loan owed by her mother. These payments demonstrate that debtor has the ability to maintain a minimal standard of living while paying an additional $126 per month.[6]

APPLICATION OF *BRUNNER* TEST

**1.  INABILITY OF DEBTOR TO MAINTAIN A MINIMAL STANDARD OF LIVING AND PAY THE LOANS**

"A minimal standard of living does not require a debtor to live in poverty, but it does require her to reduce her expenses to an amount that is minimally necessary to meet her basic needs." *Perkins v. Pa. Higher Educ. Assistance Agency (In re*

---

[6] Debtor testified at trial that she had stopped making these payments.

*Perkins)*, 318 B.R. 300, 305 (Bankr. M.D.N.C. 2004). *See Murphy v. Sallie Mae (In re Murphy)*, 305 B.R. 780, 793 (Bankr. E.D. Va. 2004) ("the bankruptcy court must determine what amount is minimally necessary to ensure that the debtor's needs for care, including food, shelter, clothing and medical treatment are met."). Courts in the Fourth Circuit "generally do not find an inability to maintain a minimal standard of living where a debtor shows a surplus of income over expenses." *Burton v. Educ. Credit Mgmt. Corp. (In re Burton)*, 339 B.R. 856, 871 (Bankr. E.D. Va. 2006).

It is reasonably clear from the evidence in this case that debtor has been unable to show she cannot maintain a minimal standard of living if she is required to repay the loans. Cash deposits to her bank accounts indicate that debtor has supplemented her SSDI income, and bank records establish that the debtor has made monthly payments of $126 since June 2011 in payment of a loan owed by her mother. Debtor has a current ability to pay at least this amount on a monthly basis and maintain a minimal standard of living.

Debtor has not minimized her expenses. She has spent thousands of dollars on gambling trips, which would have gone far to pay down her student debt. This conduct does not demonstrate efforts to minimize her expenses.

**2. ADDITIONAL CIRCUMSTANCES THAT INDICATE DEBTOR'S INABILITY TO PAY IS LIKELY TO PERSIST THROUGHOUT THE STUDENT LOAN REPAYMENT PERIOD**

Even if debtor had shown a current inability to pay, she has failed to show additional circumstances establishing that a current inability to pay will continue.

11

The second element of the *Brunner* test, that additional circumstances exist indicating that debtor's present inability to repay the student loans is likely to persist for significant portion of loan repayment period, requires a "certainty of hopelessness," rather than simply a present inability to pay. *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003). *See Weir v. Paige (In re Weir)*, 296 B.R. 710, 716 (Bankr. E.D. Va. 2002) ("Undue hardship is not based on a present inability to pay but rather upon a 'certainty of hopelessness that future payments cannot be made.'") (quoting *Love v. United States (In re Love)*, 33 B.R. 753, 755 (Bankr. E.D. Va. 1983)). The certainty of hopelessness in making future payments is "based on the 'presence of unique or extraordinary circumstances which would render it unlikely that debtor ever would be able to honor his [or her] obligations.'" *In re Malloy*, 155 B.R. 940, 945 fn.5 (E.D. Va. 1993) (quoting *Ballard v. Virginia (In re Ballard)*, 60 B.R. 673, 674-75 (Bankr. W.D. Va. 1986)).

Serious illness is generally recognized "as one of the most frequent bases for demonstrating unique or exceptional circumstances justifying a determination of undue hardship." *Hoskins v. Educ. Credit Mgmt. Corp. (In re Hoskins)*, 292 B.R. 883, 887 (Bankr. C.D. Ill. 2003) (citing *Brunner*); *see Pace v. Educ. Credit Mgmt. Corp. (In re Pace)*, 288 B.R. 788, 792 (Bankr. S.D. Ohio 2003) ("A significant focus regarding the undue hardship inquiry centers around medical conditions that are so serious, that they impair a debtor's earning capacity for the duration of the repayment period").

Although debtor has degenerative disk disease stemming from injury to her back, she has managed this condition with injection treatments (currently on a quarterly basis) since 2005. While it is true that the Social Security Administration determined that debtor was entitled to disability under its regulations, she also has more recently been determined by her former employer's disability insurance carrier not to be disabled; that determination was affirmed upon judicial review. On her Functional Capacity Examination on June 21, 2005, the debtor was found to have "self-limited on 79% of the 14 tasks," which "significantly exceed[ed] normal limits." Exhibit O, pp. 1-2. She has not received surgery that has been recommended in the event that injection therapy fails to alleviate her symptoms, and her physician has stated that he expects her condition to improve to the extent that she could return to work full-time within three months after surgery.[7] In order to find that the second part of the *Brunner* standard is satisfied, the court must determine both that the debtor has a physical condition that actually impairs her ability to work and that the condition will likely persist throughout the student loan repayment period. Based on the totality of the evidence, the court finds that debtor has failed to carry her burden with respect to either requirement of the second element of the *Brunner* test.

## 3. DEBTOR'S GOOD FAITH EFFORT TO REPAY THE LOAN

In order to be entitled to a hardship discharge under the *Brunner* standard,

---

[7] This court observed debtor's capacity to sit during trial and observed her willingness to sit when given the opportunity to stand.

13

debtor must demonstrate that she has made a good faith effort to repay the loans. This includes a showing of: (1) efforts to maximize the debtor's income; (2) efforts to minimize the debtor's expenses; and (3) attempts to make payments on the loans, or negotiate deferrals, forbearances, or other reasonable, affordable or flexible repayment plans. *See Lohr v. Sallie Mae (In re Lohr)*, 252 B.R. 84, 88 (Bankr. E.D. Va. 2000). In this case, debtor has made no efforts to maximize her income. In 2000, she had a job, which she recently had acquired, that paid $53,000.00 per year. When she had her accident, she made no effort to retain her job by requesting reasonable accommodations from her employer. Since obtaining SSDI, she has made no efforts to find another job. As previously noted, she has not minimized her expenses, having spent several thousand dollars in connection with gambling. Despite having received the separate lump sum payments since 2000, the smallest of which exceeded $10,000.00, she did not use any of the funds to repay the student loans. And the fact that debtor sought and obtained deferments and forbearances of her student loan, by itself, is not persuasive evidence of good faith. A debtor fails to meet the good faith effort requirement, notwithstanding deferments, forbearances or other token payments, when the debtor otherwise obtains substantial funds, of which none is applied to the loans. Good faith is especially lacking where a significant portion of such funds–in this case, several thousand dollars–is spent frivolously or wastefully.

CONCLUSION

The court is sympathetic to Ms. Pettaway's physical problems. However, in

Code § 523(a)(8), as interpreted in a great many court decisions, Congress has made it extremely difficult for a debtor to discharge a student loan. Unfortunately, the debtor here has failed to produce evidence to satisfy her burden of proof for undue hardship. A separate order will be entered holding that the debtor's education loan will not be excepted from her discharge.

Plaintiff is ADVISED that she has the right to appeal this decision of the court. Failure to file a written notice of appeal with the Clerk of Court within fourteen (14) days of the date of entry of the Judgment Order may result in the loss of the right to appeal. *See* 28 U.S.C. § 158(a) and Rules 8001 and 8002 of the Rules of Bankruptcy Procedure.

SIGNED: <u>February 27, 2013</u>

/s/ DOUGLAS O. TICE JR.
DOUGLAS O. TICE JR.
UNITED STATES BANKRUPTCY JUDGE

Copies to:

Sonya D. Pettaway
919 Covington Court
Waverly, Virginia 23890
Pro Se Chapter 7 Debtor

Robert P. McIntosh
U.S. Attorney's Office
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Counsel for Defendant

Robert B. Van Arsdale
United States Trustee's Office
701 E. Broad Street, Suite 4304
Richmond, Virginia 23219
Assistant U.S. Trustee

16